**Sebastian BANKS, Plaintiff,**

v.

**CITY OF ALBANY, New York Fire Department; Civil Service Department; Gerald D. Jennings, Mayor; and James Larson, Fire Chief, Defendants.**

**No. 95–CV–761.**

United States District Court, N.D. New York.

Jan. 28, 1997.

Law Offices of Peter M. Pryor (Peter M. Pryor, of counsel), Albany, NY, for Plaintiff.

City of Albany Corporation Counsel (Stacy Kitt, of counsel), Albany, NY, for Defendants.

## MEMORANDUM–DECISION & ORDER

McAVOY, Chief Judge.

## I. BACKGROUND

Plaintiff Sebastian Banks alleges that the defendants unlawfully discriminated against him on the basis of his race by refusing to hire him for employment in the Albany Fire Department, in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.* Banks also claims that Defendants violated his constitutional right of equal employment guaranteed by the Fifth and Fourteenth Amendments. In addition, Banks asserts that Defendants violated Article 23–A of the New York State Corrections Law by denying him employment on the basis of his past criminal convictions.

On June 5, 1993, Sebastian Banks, a black male and lifelong resident of Albany County, took an open competitive civil service examination for the position of firefighter for the City of Albany. Banks scored an 85 on the examination. A total of 154 candidates passed the June 5, 1993 examination. No candidate scored above 95; nineteen individuals received scores of 95; nineteen individuals received scores of 90; and thirty-eight

individuals received scores of 85. The remaining seventy-eight candidates did not score high enough to be considered for employment.

On November 24, 1993, the Albany Municipal Civil Service Commission ("Commission") established an "Eligible List" containing the names and scores of the 154 candidates who passed the June 5, 1993 examination. (Kitt Aff., Exh. 1). The Eligible List had an effective date of January 20, 1993 and expired January 20, 1994. From this Eligible List of candidates, P. Marsolais, Secretary of the Commission, certified 67 candidates as eligible for the position of firefighter on May 20, 1994. (Kitt Aff., Exh. 2). As required by New York State Civil Service Law §§ 50 & 57, the actual appointment of firefighters must be from this certified list.

On May 24, 1994, four days after the certification of eligibles, Fire Chief James Larson appointed nine candidates to the position of firefighter. Six of the nine appointed candidates had a score of 90 on the June 5, 1993 exam. The remaining two appointed candidates had a score of 85. Although Banks was on the list of certified eligible candidates for the position of firefighter, and had scored an 85 on the exam, he was not chosen.

In his deposition, Chief Larson stated that he appointed the two candidates with a score of 85 without reviewing the background of any other candidates who also scored an 85. (Larson Tr. at 61–62). Instead, Chief Larson stated that he had already decided he wanted the two candidates, Mr. Dagget and Mr. Rhatigan, based on his relationship with their families. (Larson Tr. at 61–65).

Presently before the Court are Defendants' Motion for Summary Judgment and Plaintiff's Cross–Motion for Summary Judgment.

## II. DISCUSSION

### A. Summary Judgment Standard

Pursuant to Fed.R.Civ.P. 56(c), a court may grant summary judgment if it appears "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Furthermore, it is the substantive law that will determine what facts are material to the outcome of a case. *See Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511.

Initially, the moving party has the burden of informing the court of the basis of its motion. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). If the moving party satisfies its burden, the burden then shifts to the non-moving party to come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The Court must then resolve all ambiguities and draw all reasonable inferences against the moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). However, the non-moving party must do more than simply show "that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1355–56. Only when the Court concludes that no rational finder of fact can find in favor of the non-moving party should summary judgment be granted. *Gallo v. Prudential Residential. Servs., Ltd.,* 22 F.3d 1219, 1223 (2d Cir.1994).

## B. Title VII

Initially, the Court notes that although summary judgment is no longer a disfavored process for the elimination of groundless claims, *see Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552 (summary judgment favored to dispose of meritless claims), a district court should be wary of granting summary judgment in a discrimination case because the device is generally inappropriate where, as is typical, an employer's state of mind is relevant. *Gallo,* 22 F.3d at 1224. This is not to say that summary judgment is wholly inappropriate; rather, as the Second Circuit has noted, "the summary judgment rule would be rendered sterile ... if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion. [T]he purposes of summary judgment ... apply no less to discrimination cases than to ... other areas of litigation." *Meiri v. Da-*

*con,* 759 F.2d 989, 998 (2d Cir.), *cert. denied,* 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985). Considering the relative ease of bringing a suit alleging discrimination and the difficulty and expense of defending against such a suit, courts correctly find summary judgment proper where allegations of discriminatory intent are merely conclusory.

### i. *Prima facie* case under Title VII

■ Designed " 'to achieve equality of employment opportunities and remove barriers that have operated in the past to favor an identifiable group of white employees over other employees,' " *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 417, 95 S.Ct. 2362, 2371, 45 L.Ed.2d 280 (1975) (*quoting Griggs v. Duke Power Co.,* 401 U.S. 424, 429–30, 91 S.Ct. 849, 852–53, 28 L.Ed.2d 158 (1971)), Title VII prohibits not only overt and intentional discrimination, but also discrimination resulting from practices that are facially neutral but have a "disparate impact" on a protected group. *See, e.g., International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 335–36 n. 15, 97 S.Ct. 1843, 1854–55 n. 15, 52 L.Ed.2d 396 (1977); *Griggs,* 401 U.S. at 431, 91 S.Ct. at 853. Section 703(a) of Title VII defines "unlawful employment practice" in this way:

> It shall be an unlawful employment practice for an employer .... to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin ....

42 U.S.C. § 2000e–2(a)(1).

In the Second Circuit, Title VII cases are analyzed under the familiar framework of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under the test articulated in *McDonnell Douglas,* a plaintiff

> must demonstrate that: (i) he is a member of a protected class; (ii) he was qualified for the position; (iii) he was subjected to an adverse employment decision; and (iv) either the position remained open or he was replaced by someone not a member of his protected class.

*Sergio de la Cruz v. New York City Human Resources Administration Dept. of Social Services,* 82 F.3d 16, 20 (2d Cir.1996) (*citing McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824); *see also Owens v. New York City Hous. Auth.,* 934 F.2d 405, 408–09 (2d Cir. 1991); *Sweeney v. Research Found. of State Univ. of New York,* 711 F.2d 1179, 1184–85 (2d Cir.1983). Once a *prima facie* case has been established, "[t]he employer then has the burden of articulating a legitimate, non-discriminatory reason for its action.... The burden shifts back at that point to the plaintiff to prove that this reason is pretextual." *Promisel v. First American Artificial Flowers,* 943 F.2d 251, 259 (2d Cir.1991), *cert. denied,* 502 U.S. 1060, 112 S.Ct. 939, 117 L.Ed.2d 110 (1992).

The Court will now examine each of the steps in the burden shifting analysis in order to determine whether Plaintiff has put forth a viable cause of action. We must be mindful that regardless of how these burdens are described, Plaintiff retains the ultimate burden of persuading the fact finder. *See Lopez v. Metropolitan Life Ins. Co.,* 930 F.2d 157, 161 (2d Cir.1991).

Here, the parties do not dispute the fact that Banks has established the first element of his *prima facie* case; Banks is an African–American. In addition, Defendants do not dispute that the nine firefighters appointed were white. The present controversy surrounds the remaining elements: job qualification and rejection.

· On the issue of qualification, the minimum requirements for the position of firefighter were contained in two announcements, dated March 31, 1993 and November 21, 1990. (Banks Aff., Exhs. 4 & 5). The minimum qualifications include: graduation from high school or possession of a high school equivalency diploma; age between 20 and 36; legal residency in Albany County for at least 12 months; a valid class 5 drivers license; Emergency Medical Technician (EMT) Certification; citizenship in the United States; passing a physical and medical exam; drug testing; and passing a qualifying psychological examination. (Banks Aff., Exh. 4).

Defendants assert that Banks is not qualified for the position of firefighter. First,

they assert that he did not pass a medical exam or a psychological examination. However, Banks never took these exams. Although it is unclear when a candidate for firefighter is required to take the medical and psychological exams, it is clear that an exam is scheduled by, and a candidate is notified by, the Albany Fire Department itself. (Larson Tr. at 54–58). As this was never done, Defendants cannot assert now that Banks is unqualified because he did not pass an exam that they never scheduled for him.

Defendants also argue that Banks was not a certified EMT at the time he sought appointment. Defendants argue that Banks' certification was invalid because in applying to the New York State Department of Health for EMT certification and recertification, he twice improperly signed an affirmation at the bottom of his application that stated that he had never been convicted of certain enumerated crimes, when in fact he had a number of such convictions.

Although this is serious conduct on the part of Plaintiff, he was, and still is, certified as an EMT. In fact, in a letter from the New York State Department of Health ("DOH") dated October 24, 1996, the DOH states that "Banks is currently a certified Emergency Medical Technician (EMT). His certification expires on May 31, 1998. Although an investigative file is open, there has been no action taken against Mr. Banks, nor has the Department made a determination to revoke his EMT certification." (Banks Aff., Exh. 8). Clearly, if the DOH rescinds Banks' EMT certification he cannot be considered "qualified" to be a firefighter. However, in the absence of DOH action, it is not within the purview of the Albany Fire Department to decide on its own whether Banks' conduct retroactively voids his EMT certification. Accordingly, the Court must conclude that Banks is qualified to be a firefighter and has thus met the qualification requirement under *McDonnell Douglas.*

Turning to the next prong of the *McDonnell Douglas* test, Defendants assert that even though Banks was not hired as a firefighter, he nevertheless was not "rejected." Defendants argue: "The selection of other

candidates had no effect on his eligibility for hire. Had the City of Albany done additional hiring off of the Civil Service List at issue, Mr. Banks would have been eligible for consideration." (Defs' Mem. of Law at 3). Apparently, every unemployed worker can take consolation in the thought that they were not "rejected," they just simply "were not hired."

Semantics aside, Defendants' argument is absurd. Were this Court to adopt Defendants' definition of "rejection" this would completely eviscerate Title VII and most other state and federal statutes dealing with employment discrimination. Under Defendants' nonsensical definition, a job applicant would only be "rejected" if the employer actually said "you are rejected." In other words, rejection would never occur, and an employer could perpetually insulate itself from Title VII, so long as the employer kept the candidate's application on file. This is clearly not the law, and Defendants' constrained definition of "rejection" is rejected, or rather, not accepted.

■ Furthermore, Banks' rejection occurred under circumstances giving rise to an inference of discrimination. Under Title VII, discrimination can be demonstrated through evidence of either "disparate treatment" or "disparate impact." *See Cosgrove v. Sears, Roebuck & Co.*, 9 F.3d 1033, 1041 (2nd Cir. 1993). To show disparate treatment, the plaintiff is "required to prove that the defendant had a discriminatory intent or motive." *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 986, 108 S.Ct. 2777, 2784, 101 L.Ed.2d 827 (1988). Disparate impact, on the other hand is based upon the premise "that some employment practices, adopted without a deliberately discriminatory motive, may in operation be functionally equivalent to intentional discrimination." *Watson*, 487 U.S. at 987, 108 S.Ct. at 2785. The evidence in disparate impact cases "usually focuses on statistical disparities, rather than specific incidents, and on competing explanations for those disparities." *Watson*, 487 U.S. at 986–87, 108 S.Ct. at 2784–85.

### a. Disparate Impact

■ In *Griggs v. Duke Power Co.*, the Supreme Court stated that Title VII bans not only intentional discrimination, but also those employment practices that result in disparate impact. 401 U.S. at 424, 91 S.Ct. at 849. Disparate impact claims involve employment practices "that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group and cannot be justified on business necessity." *Int'l Bd. of Teamsters v. United States*, 431 U.S. 324, 335–36 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977).

■ A plaintiff proceeding under this theory need not offer proof of discriminatory motive to make out a *prima facie* case. *See, e.g., Griggs*, 401 U.S. at 430–32, 91 S.Ct. at 853–54. Instead, a plaintiff must isolate and identify a particular employment practice that is the cause of the disparity and provide evidence sufficient to raise an inference of causation. *See Watson v. Fort Worth Bank and Trust*, 487 U.S. 977, 994–95, 108 S.Ct. 2777, 2788–89, 101 L.Ed.2d 827 (1988). Generally, it is a comparison between the racial composition of qualified persons in the labor market and persons holding at-issue jobs that forms the proper basis for the initial inquiry in a disparate impact case. *See Wards Cove Packing Co., Inc. v. Atonio*, 490 U.S. 642, 650–51, 109 S.Ct. 2115, 2121–22, 104 L.Ed.2d 733 (1989).

Here, Plaintiff points to Chief Larson's wholly subjective criterion for appointing firefighters as the employment practice that causes a disparate impact. First, Plaintiff notes that Chief Larson is vested with the sole power to determine which certified candidates are appointed to firefighter. As Defendant Larson stated in his deposition, all appointments were made by him without the input of others, except that people would look at the list of eligible candidates and comment: "I know this person, I know that person. Isn't that so and so's brother?" (Larson Tr. at 27–28). Second, the *procedure* that Larson used to pick the nine firefighters was flawed in that Larson never spoke with any of the candidates with respect to their appointments—he simply relied on their submitted background information—although he failed to follow even this procedure when he appointed two candidates with a score of 85 without reading any of the

other similarly situated candidates' background information, including the information submitted by Sebastian Banks. (Larson Tr. at 32).

Finally, Banks argues that the actual criterion used by Larson in making his appointments is improperly subjective. With regard to the nine candidates appointed, as well as the two candidates chosen that had the same score as Banks, the following colloquy took place during Chief Larson's Deposition:

Q. ... I'm going to ask you again, sir, to tell me what factors other than the rule of three that you took into consideration in making those nine appointments?

A. It was something that I wished to do personally.

Q. When you say you wished to do it personally, why did you have such a personal stake in[ ] the nine appointments?

A. Michael Dagget, who I had known since really his birth ... I wanted to help him out. ...

Q. And you wanted to help Michael Dagget personally, and you had reasons for wanting to help Justin Rhatigan, isn't that correct?

A. Yes, Sir.

Q. And what were those reasons?

A. The fact that I worked with his father and brothers throughout my entire career on the department, both working for them as a firefighter and having them work for me when they were fire fighters.

(Larson Tr. at 63–64).

Based on the foregoing statements by Chief Larson, Banks asserts that Larson, the only person who decides which candidates will be firefighters, utilized a wholly personal and subjective process for appointing eligible candidates as firefighters. Consequently, the critical qualifications for firefighter are: (1) know Chief Larson personally, and (2) have close familial ties with the Albany Fire Department. For minority candidates, these qualifications pose a significant obstacle. As Plaintiff states in his Memorandum of Law in Opposition: "[W]hen the dearth of blacks in the AFD is considered, along with its dismal employment practices, and if minorities would have to rely upon family ties and friendships within the AFD for access, it will be generations before the few blacks that are presently employed could recommend their sons, daughters or other relatives for appointments." (Pltf's Mem. of Law at 6).

Accordingly, Banks has sufficiently isolated and identified a suspect employment practice within the Albany Fire Department. *See Watson*, 487 U.S. at 991, 108 S.Ct. at 2787 (noting the disparate impact theory of Title VII liability may be utilized to challenge both objective and subjective selection processes); *Wards Cove*, 490 U.S. at 665 n. 9, 109 S.Ct. at 2129–30 n. 9 ("This is not to say that a specific practice, such as nepotism, if it were proved to exist, could not itself be subject to challenge if it had a disparate impact on minorities.") Thus, Banks now must articulate a causal connection between that practice and demonstrate a disparate impact on a protected group.

Although a comparison between the racial composition of qualified persons in the labor market and persons holding at-issue jobs generally forms the proper basis for the initial inquiry in a disparate impact case, *see Wards Cove*, 490 U.S. at 650–55, 109 S.Ct. at 2121–24, in cases where such labor market statistics will be difficult if not impossible to ascertain courts have recognized that certain other statistics—such as measures indicating the racial composition of "otherwise-qualified applicants" for at-issue jobs—are equally probative for this purpose. *See, e.g., New York City Transit Authority v. Beazer*, 440 U.S. 568, 585, 99 S.Ct. 1355, 1365, 59 L.Ed.2d 587 (1979). Furthermore, where "figures for the general population might ... accurately reflect the pool of qualified job applicants," courts have relied on such statistics as well. *See, e.g., Dothard v. Rawlinson*, 433 U.S. 321, 329–330, 97 S.Ct. 2720, 2726–27, 53 L.Ed.2d 786 (1977); *Wards Cove Packing*, 490 U.S. at 650–51, 109 S.Ct. at 2121–22.

In addition, a plaintiff in a disparate impact case need only offer statistical evidence of a kind and degree sufficient to show that the practice in question has a greater negative impact on a minority group; the Supreme Court has dictated that no particular mathematical formula must be imple-

mented and satisfied. *See Watson,* 487 U.S. at 994–95, 108 S.Ct. at 2789–90. Instead, "[c]ases must be evaluated on their own terms." *Council 31, American Fed'n of State, County, & Mun. Employees v. Ward,* 978 F.2d 373, 379 (7th Cir.1992).

In support of his assertion that the Albany Fire Department's subjective criteria for choosing firefighters results in a disparate impact on minorities, Banks provides a number of statistics.[1] First, Plaintiff notes that between 1987 and 1994, the Albany Fire Department appointed only 2 black males as firefighters out of a total of 129 white male appointments over the same time period. Second, the Albany Fire Department presently has only 8 black firefighters out of a total duty roster of 261, resulting in a statistical population of blacks in the Albany Fire Department of 3.1%. In comparison, 1990 Census data show a black population in the City of Albany of 21.5%, and a black population in the County of Albany of 8.6%.

▮ Accordingly, there is little doubt that Banks has established a *prima facie* case of discrimination based on race. *See Quaratino v. Tiffany & Co.,* 71 F.3d 58, 65–66 (2d Cir.1995) ("plaintiff's burden of proof in a … discrimination action is *de minimis* at the *prima facie* stage"). This is not to say that the Albany Fire Department's hiring procedure is *in fact* the cause of the noted statistical disparity; perhaps black men and women are less interested in being firefighters in the Albany Fire Department. Instead, the Court's holding is more limited. The Court finds only that Banks has met his *de minimis* burden of showing that a genuine issue of material fact exists as to whether the Albany

Fire Department's hiring procedure resulted in disparate impact on a protected group.

## ii. Business Necessity

Once a plaintiff has established a *prima facie* case, the employer can respond with evidence that the "challenged practice is job-related for the position in question and consistent with business necessity." 42 U.S.C. § 2000e–2(k)(1)(A)(i).

▮ Establishment of the *prima facie* case creates a presumption that the employer unlawfully discriminated against the employee. *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981). Once such a *prima facie* case has been made out, the defendant must show that the challenged action is demonstrably necessary to meet an important business goal for Title VII purposes.

The Supreme Court held in *Wards Cove Packing Co. v. Atonio,* 490 U.S. 642, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989), that the defendant's burden on the "business necessity" defense is only one of production; under *Wards Cove* the ultimate burden of persuasion remains at all times with the plaintiff. 490 U.S. at 659, 109 S.Ct. at 2126. However, Congress statutorily reversed the *Wards Cove* ruling by passing the Civil Rights Act of 1991, Pub.L. No. 102–166, 105 Stat. 1071, which amended Title VII to provide that, once a plaintiff makes out a *prima facie* case, the full burden of proof shifts to the defendant who must demonstrate "business necessity" in order to avoid liability. § 105(a), 105 Stat. at 1074–75 (codified at 42 U.S.C. §§ 2000e–2(k)(1)(A)).[2]

---

1. In light of the fact that Defendants do not challenge these statistics, for the purpose of this motion the Court assumes that Plaintiff's proffered statistics are accurate.

2. Prior to *Wards Cove,* the "business necessity" showing was an affirmative defense for which the defendant bore the burden of proof and risk of nonpersuasion. *See Dothard v. Rawlinson,* 433 U.S. 321, 329, 97 S.Ct. 2720, 2726–27, 53 L.Ed.2d 786 (1977); *Griggs,* 401 U.S. at 432, 91 S.Ct. at 854; *Larkin v. Pullman–Standard Div., Pullman, Inc.,* 854 F.2d 1549, 1580 (11th Cir. 1988), *vacated sub nom., Pullman–Standard, Inc. v. Swint,* 493 U.S. 929, 110 S.Ct. 316, 107 L.Ed.2d 307 (1989). In 1989, the Supreme

Court held that the defendant bore only the burden of coming forward with an alleged business-related justification for the challenged practice which the plaintiff would then have to disprove in order to prevail. *Wards Cove,* 490 U.S. at 659, 109 S.Ct. at 2126. The Court also broadened the scope of the necessity defense by holding that practices causing a disparate impact were permissible, even if they could not be shown to be absolutely necessary, so long as they "served, in a significant way, the legitimate employment goals of the employer." *Wards Cove,* 490 U.S. at 659, 109 S.Ct. at 2126. These changes were also statutorily reversed by the Civil Rights Act of 1991. 42 U.S.C. § 2000e–2(k)(1)(A).

For example, a commonly asserted business necessity defense is the protection of employees from workplace hazards. *See, e.g., Hayes v. Shelby Memorial Hosp.,* 726 F.2d 1543, 1552 n. 14 (11th Cir.1984); *New York City Transit Auth. v. Beazer,* 440 U.S. 568, 587 & n. 31, 99 S.Ct. 1355, 1366 & n. 31, 59 L.Ed.2d 587 (1979); *Dothard,* 433 U.S. at 331 n. 14, 97 S.Ct. at 2728 n. 14. *But cf. International Union, U.A.W. v. Johnson Controls,* 499 U.S. 187, 111 S.Ct. 1196, 113 L.Ed.2d 158 (1991) (employers desire to guard against birth defects in employees' potential offspring does not constitute bona fide occupational qualification justifying facially discriminatory employment policy).

However, merely asserting a business necessity rationale does not suffice to prove the defense. *See MacLennan v. American Airlines, Inc.,* 440 F.Supp. 466, 472 (E.D.Va. 1977) ("[T]he incantation of a safety rationale is not an abracadabra to which [a] [c]ourt must defer judgment."). An employer's subjective belief that a practice is necessary, without any supporting evidence, is insufficient to justify a discriminatory practice. *See Craig v. County of Los Angeles,* 626 F.2d 659, 667 n. 8 (9th Cir.1980); *United States v. Lee Way Motor Freight, Inc.,* 625 F.2d 918, 941–43 (10th Cir.1979). In order to establish a business necessity defense, employers have been required to present convincing expert testimony demonstrating that a challenged practice is in fact required to achieve the desired goal. *See Burwell v. Eastern Air Lines, Inc.,* 633 F.2d 361, 365–66 (4th Cir. 1980); *Harriss v. Pan Am. World Airways, Inc.,* 649 F.2d 670, 675 (9th Cir.1980); *Levin v. Delta Air Lines, Inc.,* 730 F.2d 994, 997 (5th Cir.1984).

■ Here, Defendants offer no specific justification as to why Chief Larson's subjective determination based on personal contact and familial relationships is a *business necessity* in the hiring of firefighters. Instead, Defendants assert that Larson made his decision because "[i]t was the Chief's belief that each of these people had exceptional familiarity with the work and unusual schedule of the Department, and would work well within the organization." (Defs' Mem. of Law at 5). These are laudable considerations, but the Court is left with the question of how Chief Larson knew that Dagget and Rhatigan were the best qualified candidates without even reading the background information on the other similarly situated candidates? Perhaps there was another candidate on the list who had years of experience as a firefighter, perhaps even experience as a fire chief!

The Court does not wish to imply that Chief Larson's subjective criterion is unsound. Although it may be inferred that familial ties to the Albany Fire Department and a close personal relationship with Chief Larson are an indication of future excellence as a firefighter, Defendants offer no support for the proposition that the Chief's subjective criterion is a *business necessity* in the appointment of the most qualified candidates. Moreover, common sense dictates that a better procedure for finding the *most qualified* candidate might be to review the background information of *all* the eligible candidates who scored an 85 before deciding which candidates have the greatest "familiarity with the work and unusual schedule of the Department, and would work well within the organization."

Accordingly, Defendants have failed to demonstrate that the "challenged practice is job-related for the position in question and consistent with business necessity." 42 U.S.C. § 2000e–2(k)(1)(A)(i). Thus Defendant's Motion for Summary Judgment must be denied.

## III. CONCLUSION

In summary, Plaintiff has established a *prima facie* case of discrimination in violation of Title VII that Defendants have not rebutted by offering a business necessity justifying the challenged hiring practice. Accordingly, Defendants' Motion for Summary Judgment seeking dismissal of Plaintiff's Title VII claim is DENIED.

However, Plaintiff is not entitled to relief on his Cross–Motion for Summary Judgment because material facts remain in dispute. Thus, Plaintiff's Cross–Motion for Summary Judgment is DENIED. Furthermore, because neither party addressed Plaintiff's remaining claims, the Court did not consider

them in its analysis of the parties' respective Motions for Summary Judgment.

**IT IS SO ORDERED.**